Daniel R. Watkins (SBN 163571)
dw@wl-llp.com
WATKINS & LETOFSKY, LLP
2900 S. Harbor Blvd., Suite 240
Santa Ana, CA 92704
Office: (949) 476-9400; Fax: (949) 476-9407

Attorneys for Plaintiffs, William N. Moseley, Jr., and Truth for Health Foundation a fictitious business name of Straight Truth About Hormones Foundation, Inc.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM N. MOSELEY, JR., an individual; and TRUTH FOR HEALTH FOUNDATION, a fictitious business name of STRAIGHT TRUTH ABOUT HORMONES FOUNDATION, INC., a 501(c)(3) non profit corporation on behalf of its members;<br><br>Plaintiff,<br><br>v.<br><br>JOHN B. NOWELL, individually and in his official capacity as Chief of Naval Personnel and COVID Consolidated Disposition Authority (CCDA); SHEA S. THOMPSON, individually and in his official capacity Commanding Officer, USS BUNKER HILL (CG 52); and DOES 1-100;<br><br>Defendants. | Case No.:   1:22-at-00760<br><br>[Assigned to the Hon._____, Courtroom ____]<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND MONETARY DAMAGES** |

COMES NOW, Plaintiffs, Straight Truth About Hormones Foundation, Inc. dba Truth for Health Foundation ("Truth For Health Foundation") and William N. Moseley, Jr. who now file this civil action against Defendants and each of them seeking injunctive and declaratory relief and monetary damages, and allege as follows:

///

## INTRODUCTION

1.     Plaintiff William N. Moseley Jr is an active-duty Lieutenant ("LT Moseley" or "Lieutenant Moseley") and member of the United States Navy, who has faithfully and honorably served his country as a commissioned Naval officer for over twenty-two years.

2.     Plaintiff Straight Truth About Hormones Foundation, Inc., dba Truth For Health Foundation ("Truth For Health Foundation") is a 501(c)(3) public charity incorporated in Arizona whose members include Plaintiff LT Moseley as well as other military personnel impacted by the illegal conduct of the Defendants in their official capacity and the military apparatus in general ("Members").  Truth For Health Foundation advocates for its members' basic human and civil rights related to preservation of life, the right to bodily integrity, health and quality of life, medical freedom, and securing the autonomy of the physician-patient relationship and the ability to engage in unconstrained medical decision-making tailored to the needs of the individual person.  Truth For Health brings this action to hold Defendants accountable for the violation of violation of human and civil rights of LT Moseley and its members.

3.     On January 31, 2000, Xavier Becerra ("Becerra"), the Secretary of Health and Human Services, made a Declaration of a Public Health Emergency in relation to the SARS-COV-2 of the novel "Covid 19 pandemic."[1]

4.     On March 10, 2020, Becerra issued a declaration pursuant to the Public Readiness and Emergency Preparedness Act (PREP Act).[2] This declaration provided immunity from personal injury, property damage, and other types of claims for companies and certain individuals who manufacture, distribute, or use "covered countermeasures" for certain drugs, devices, or components that may be

---

[1] Federal Register per 85 FR 16949
[2] 42 U.S.C. § 247d-6d

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND MONETARY DAMAGES**

used to treat COVID-19 patients or combat the COVID-19 pandemic.  On the basis, Becerra finding no suitable, efficacious, or available existing licensed drugs or devices for this purpose, provided for the Emergency Use Authorization of various unlicensed Investigational New Drugs and Investigational New Devices pursuant to 24 CFR 360bbb et seq. A global pandemic was declared by the World Health Organization ("WHO") on or about March 11, 2020, in response to the release of this chimeric pathogenic disease in China in November of 2019.

5.     The PREP Act Declaration for COVID-19 extends immunity for all but willful misconduct to the manufacture, testing, development, distribution, administration, and use of "covered countermeasures" by "covered persons." Covered countermeasures include qualified pandemic or epidemic products; certain defined security countermeasures; drugs, devices, or biologics that are approved or cleared, or authorized by FDA for emergency use; and certain respiratory protective devices used to treat, diagnose, cure, prevent, or mitigate COVID-19 and their components. Covered persons included manufacturers, distributors, program planners, and other defined "qualified persons."

6.     One of the Covid Countermeasures ordered by the Secretary included the use of polymerase chain reaction ("PCR") tests, which were and are Investigational New Devices under the FDA's licensing regulations; meaning that none of these tests were FDA Approved (licensed) for sale or distribution in the United States or to US persons.

7.     PCR tests work by amplifying a segment of DNA after being heated so the DNA denatures separates into two pieces of single-stranded DNA, whereby an enzyme called "Taq polymerase" synthesizes two new strands of DNA, using the original strands as templates. This process results in the duplication of the original DNA, with each of the new molecules containing one old and one new strand of DNA. Then each of these strands can be used to create two new copies

for a pre-selected number of cycles until more than one billion exact copies of the original DNA segment is denatured and the sought-after result is achieved.[3]

8.      On or about August 23, 2021, Secretary of Defense Lloyd Austin ("Austin") ordered compulsory Covid-19 vaccinations using a variety of EUA injectables collectively called "Covid 19 Vaccines"; yet the orders by Austin specifically called for the vaccination using only FDA approved vaccines, which did not yet and still do not exist today as an FDA Approved (licensed) product manufactured in accordance with FDA regulations that allow for the sale and distribution of such products in the United States and to US Persons.

9.      On or about October 21 of 2021, Austin released a new order to begin testing some asymptomatic service members as part of the next phase of its strategy "to break the chain of coronavirus disease 2019 transmission and to protect the health of the force."[4] The multipronged approach also called for COVID-19 surveillance, contact tracing and restriction of movement.   The use of PCR testing of servicemembers throughout the military began in earnest utilizing these Emergency Use Only, Investigational New Devices ("EUA/IND") per FDA regulations.

10.      Because these tests were and remain experimental and Emergency Use only as of the date of this complaint, 10 USC 1107 and 10 USC 1107a as the applicable statutes, require the Informed Consent be obtained by all persons being administered said EUA tests; no differently than all persons being provided EUA Covid 19 vaccines must provide Informed Consent.   This law and requirement for tests and drugs is well supported in this instance given that many of the EUA PCR tests used for the Covid 19 emergency countermeasures have suffered a Class 1 Recall – the highest order of recall provided by the FDA due to the risk of serious

---

[3] https://www.genome.gov/about-genomics/fact-sheets/Polymerase-Chain-Reaction-Fact-Sheet

[4] https://www.militaryonesource.mil/family-relationships/family-life/covid-19-resources/covid-19-testing-and-surveillance/

injury or death.   Likewise, the VAERS reporting system now details tens of thousands of fatalities and millions of Serious Adverse Events directly attributed to the Covid 19 Vaccines in the United States alone.

11.   At no material time during this period did the Defendants or the Department of Defense provide any material or make compulsory the provision of Informed Consent among the service members tested or vaccinated against the Covid 19 pathogen, which has a 99.97% survivability rate among the class of people serving in the Armed Forces.[5]

12.   Informed consent laws draw from the first principles of our Nation that sovereignty comes from Our Creator to the individual, and those individuals institute government to preserve sacred rights.   The Fifth and Fourteenth Amendments' protections of life, liberty, and property limits government's authority regarding nonconsensual medical treatments forming the basis for claims of Battery in American jurisprudence.   Despite the clear prohibition, American tragedies of forced sterilization (*Buck v. Bell* 274 U.S. 200 (1927)), race-based internment (Korematsu v. United States, 323 U.S. 214 (1944)), fines for vaccine refusal (Jacobson v. Massachusetts, 197 U.S. 11 (1905)), and medical experiments in America in the early 1900's medical tyranny exposed in the Nuremberg Trials. Wise to the threats of medical tyranny and how to prevent it, the World War II victors authored the Nuremburg Code[6], the Geneva Convention, and the Declaration of Human Rights and our nation returned to its first principles, assumed a moral and international leadership role, and explicitly infused informed consent into our laws, primarily through 21 U.S.C. § 360bbb.   But what was learned by some is easily forgotten by others.   Doe 1 v. Rumsfeld confirmed the

---

[5] See Paragraph ** , Sworn Affidavit of LTC Theresa Long, M.D. Motion for Preliminary Injunction in Robert v. Austin 21 CV 02228, Colorado Federal District Court.  Hereinafter Exhibit 1.

[6] The Nuremberg Code established, every person must "be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision."

U.S. military violated the constitution and informed consent laws with its anthrax policy. Congress affirmed the court's ruling and subsequently passed 10 U.S.C § 1107 to ensure the institution sworn to protect our Constitution doesn't violate it.

13. Informed Consent and the right to refuse experimental medical products is so fundamental that a government of, for, and by the people assigns itself the responsibility to preserve citizen rights regarding experimental and investigational medical treatments where insufficient information or unfavorable context may impinge upon fully informed consent. Only, in very limited and restricted situations can the HHS Secretary grant Emergency Use Authorization (EUA) for products that do not have Approval (license) from the Food and Drug Administration (FDA) in accordance with 21 U.S.C. § 360bbb-3. Such products are experimental by their very nature because they have not been approved by the FDA for a particular use. Any such EUA products must be first published in the Federal Register (21 U.S.C. § 360bbb-3(h)) prior to distribution and use; sales of such products are prohibited due to their experimental nature. Furthermore, those administering EUA products to US citizens must at the minimum ensure: 1) they communicate that they are administering unapproved EUA products, 2) of the inherent risks, 3) alternatives available, and 4) are "informed" of the right to accept or refuse an EUA product. These requirements formulate the basis of the Informed Consent rules and the word "Informed" has special meaning in relation to this law and it carries its own litany of requirements to meet the definition.

14. 21 U.S.C. § 360bbb-3 passed into law via the Food, Drug, and Cosmetic Act (FDCA) and is designed to ensure citizens have Informed Consent which cannot be waived for or by the government. When information is insufficient for Informed Consent to occur, as is applicable to all EUA products, such consent must be documented and provided in written form prior to use. The extent of government authority is only to provide notification not to the abrogation of an individual's inherent rights to bodily sovereignty. Like Miranda rights, just

because the government does not do its legal diligence of informing citizens of their rights does not mean the citizens do not have the right.

15.    21 Code of Federal Regulations (CFR) Part 50 (21 CFR Part 50) outlines the extensive legal requirements for all agencies to follow in providing written and verbal informed consent to all human subjects. This notification requirement is compulsory and cannot be waived absent extreme circumstances making the possibility of obtaining it impossible (i.e. unconscious subject) 21 CFR Part 50 requires this as a condition for all unapproved products (including all unapproved drugs, all unapproved devices such as masks or test kits, and all unapproved biological products) in accordance with 21 U.S.C. § 360bbb-3(e)(1)(A).

16.    In addition, 21 CFR section 50.22 and 50.23 requires the military convene an institutional review board, independent of the financial interests of the outcome of this recommended EUA protocols. The military did not conduct institutional review board. As such, there is no legal basis for the administration of the experimental drugs or countermeasures, including the use of experimental devices, masks, and test kits.

17.    The only exception for the Federal government to *not* fulfill its moral, ethical, and legal duty of providing informed consent can only occur within the Department of Defense for very specific and codified reasons. The responsibilities of notifying service members of their inalienable right to refuse a medical treatment without coercion is codified in 10 U.S.C § 1107.  In 2001, Congress was so concerned with military violations of this requirement that it created 10 U.S.C § 1107a after the egregious anthrax fiasco stopped by the Court in Doe 1 v. Rumsfeld.  The resulting additions in 10 U.S.C § 1107a make it compulsory and explicit that only the President of the United States (POTUS) may issue a waiver of informed consent and only in very limited circumstances and after making written findings of fact relating to a specific mission.  Otherwise, the Informed

Consent requirements apply to all US citizens no matter where they reside or are found.   The lawful and unalienable right of a service member to refuse an EUA product is the balancing factor to the immense liability immunity EUA products receive once an EUA product becomes a covered countermeasure pursuant to 42 U.S.C. § 247d-6d.

18.     Defendants have ordered, misled, threatened, punished, and coerced the LT Moseley and Members (collectively referred to herein as "Plaintiffs") to use EUA products in violation of their rights per 21 U.S.C. § 360bbb-3 to notification of this right, inter alia.  At no time in the course of Plaintiffs' service has POTUS asserted his authority under 10 U.S.C § 1107A.  As such, no Presidential waiver exists, and Plaintiffs have consistently asserted their rights to refuse these experimental devices and treatments.

19.     Upon attempting to execute his right to decline, LT Moseley suffered non-judicial punishment, hazing, threats, coercion, and loss of his job onboard USS BUNKER HILL. Further Defendants have accused LT Moseley of mental health defects and have referred him to psychiatric evaluation for simply refusing to take part in the Department of Defense's grand experiment.  For these and many more reasons, LT Moseley has suffered and continues to suffer immediate, irreparable, and irreversible harm to his career, income, potential, health and future well-being.

20.     Plaintiffs seek a declaratory judgement and injunctive relief against Defendants who are in gross violation of the Fifth Amendment, 21 U.S.C. § 360bbb-3 and 10 U.S.C § 1107a, 21 CFR Part 50 laws (collectively, "the informed consent laws").  Plaintiffs seeks reprieve from Defendant's unlawful, discriminatory animus towards those who do not consent to these unlawfully ordered treatments in violation of the Religious Freedom Restoration Act, the Americans with Disabilities Act, and the Rehabilitation Act of 1973.   Plaintiffs seeks judicial review of abused "emergency" executive authorities of 21 USC §360bbb-3 and 42 U.S.C. § 247d-6d that enable the violations of other laws noted

in this complaint.  For instance, Defendant's mandate asserts licensed vaccines exist, which, if such were true would mean the emergency is over and there is no justification for EUA per 21 USC §360bbb-3.

21.    Plaintiffs seek cessation of the numerous violations of privacy protected by the Fourth Amendment emanating from Defendant's discriminatory, arbitrary, capricious, and malicious COVID policies that are fraudulent, wasteful, and abusive to Plaintiffs and members like him and the public at large. Furthermore, because Defense Department and Navy Service are not abiding by their own regulations and procedures that implement informed consent laws, the Defendants are in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq.  Finally, egregious, and excessive use of psychological warfare techniques combined with unlawful administrative punishment, threats, coercion and pecuniary harm by Defendants, provides a basis to strip the Qualified Immunity of said Defendants in light of the wartime footing of the US and Department of Defense at the time of these acts pursuant to 28 USC 2679(a)(2),[7]

## JURISDICTION AND VENUE

22.    Jurisdiction is appropriate in the Federal District Court because Plaintiffs have exhausted their administrative remedies, having been denied multiple petitions for relief and having suffered administrative prosecution, for which LT Moseley was found not guilty yet remains punished and for which there is no available remedy left to pursue administratively.

23.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises from United States Constitutional protections, violations, and issues of federal law.

24.    Congress has authorized suits to enforce federal constitutional rights by way of 42 U.S.C. § 1983.

---

[7] Harlow v. Fitzgerald, 457 U.S. 800 (1982)

25.     The Court also has jurisdiction over Defendants and their conduct under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

26.     The court also has jurisdiction to review Defendants' unlawful actions and inactions and enter appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§ 702-706 and pursuant to 28 U.S.C. §§2201-2202, which provides authority to any United States District Court to provide remedy in a case involving controversy with a federal agency in which an appropriate pleading seeks declaratory judgement.

27.     This Court has jurisdiction for issues relating to violation of 45 C.F.R. § 46.101 and 42 U.S.C. § § 289,300v-1[8]

28.     This Court has jurisdiction pursuant to 28 USC 1491 (a)(1)&(2) for breach of an express or implied contract and duties owed him by the Department of Defense.

29.     The Court also has jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action per *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689-92 (1949).

30.     The Court has authority to award attorneys' fees under 5 U.S.C. § 504 and under 28 U.S.C. § 2412.

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1402 and 28 U.S.C. § 1391(e) because Defendants are officers of an agency of the United States acting in their official capacities, this is the judicial district cover the home of record for LT. Moseley.

## **PARTIES**

32.     Plaintiff, William N. Moseley Jr., is an active-duty officer with 22 years of continuous active service. He served 15 years as an enlisted Sailor, achieving the rank of Chief Gunners Mate before picking up a direct commission

---

[8] Abdullahi v. Pfizer, 562 F.3d at 169

through the Limited Duty Officer program as an Ordnance Officer. He has completed multiple operational tours, to include SEAL Team Seven, SEAL Team One, Riverine Squadrons, USS Pinckney, USS Bunker Hill, several overseas tours, in addition multiple combat deployments to the Middle East and South Pacific. His home of record is Bakersfield, California.

33.   Plaintiff Straight Truth About Hormones Foundation, Inc., dba Truth For Health Foundation ("Truth For Health Foundation") is a 501(c)(3) public charity incorporated in Arizona whose members include Plaintiff LT Moseley as well as other military personnel impacted by the illegal conduct of the Defendants in their official capacity and the military apparatus in general ("Members"). Truth For Health Foundation advocates for its members' basic human and civil rights related to preservation of life, the right to bodily integrity, health and quality of life, medical freedom, and securing the autonomy of the physician-patient relationship and the ability to engage in unconstrained medical decision-making tailored to the needs of the individual person.

34.   Defendant John Nowell is a retired Vice Admiral in the U.S. Navy. Vice Admiral Nowell assumed duties as the Navy's 59th Chief of Naval Personnel on May 24, 2019. He led more than 26,000 dedicated professionals engaged in the recruiting, talent management, training, and development of over 400,000 Navy personnel. He is being sued individually and in his official capacity for his direct involvement and abuse of power in violating Plaintiff's Constitutional rights and violation of the aforementioned federal statutes while acting outside the scope of his official duties by enforcing an unlawful order. See 28 USC 2679(a)(2).[9]

35.   Defendant Shea Thompson is a Captain in the U.S. Navy. He was the Commanding Officer of USS BUNKER HILL (CG-52) when the unlawful order was given to LT Moseley to submit to weekly COVID-19 testing using

---

[9] Harlow v. Fitzgerald, 457 U.S. 800 (1982)

experimental emergency use authorization medical devices. Captain Thompson is currently serving as the Commodore of Surface Development Squadron One. He is being sued individually and in his official capacity for his direct involvement and abuse of power in violating Plaintiff's Constitutional rights and violation of the aforementioned federal statutes while acting outside the scope of his official duties by enforcing an unlawful order.  See 28 USC 2679(a)(2).[10]

## FACTUAL BACKGROUND

**Lieutenant Moseley is an extraordinary officer with a long history of faithful and honorable service.**

36.     Lieutenant Moseley enlisted in the Navy on February 8, 2000, where he attended basic training a Great Lakes Recruit Training Command, Illinois. LT Moseley was assigned the rating, Gunner's Mate upon graduating Gunner's Mate "A" School in September 2000. His first station was overseas at Naval Security Force Bahrain as a Security Force member. Following this tour, he was assigned to another overseas tour at Naval Security Force Guam. From there, he was assigned to SEAL Team Seven in Coronado, California as Naval Special Warfare Armorer. He completed two combat deployments to the Middle East, Habbaniyah, Iraq and Al Asad, Iraq during his tour. He was assigned to Coastal Riverine Squadron One in Imperial Beach, California. Upon completion of this tour, he was detailed back to Naval Special Warfare at SEAL Team ONE. Here he completed two deployments to Zamboanga, Philippines and one deployment to Jordan/UAE. He was directly responsible for the maintenance, training and inventory of $25M worth weapons systems and supporting equipment. At the end of this tour, Moseley was selected for the Limited Duty Officer program as a Surface Ordnance Officer. He commissioned December 1, 2014. His first assignment as an Officer was onboard USS Pinckney (DDG-91) as the Systems Test Officer. He was

---

[10] Supra at 800

directly responsible for the training, tactics and maintenance of the AEGIS Combat Weapons System. After his sea tour, he volunteered to take another overseas tour back to Guam where he served at the Naval Munitions Command Pacific. He was assigned as the Ammunition Materials Officer where he was directly responsible for 62 Sailors, coordinated joint aerial mining exercises with the Air Force, managed the largest overseas mine maintenance shop and coordinated on/off loads of various munitions on deployed surface ships. He then was detailed back to San Diego, California on the USS Bunker Hill (CG-52) as the Systems Test Officer.

37.     LT Moseley has consistently gone above and beyond the average call of duty. He has always been in the top 5% on evaluations and fitness reports at every command. He has numerous awards, to include one Combat Action Ribbon, five Navy Commendation Medals, two Army Commendation Medals, three Navy Achievement Medals and various meritorious unit citations. Additionally, he has completed countless unconventional schools, qualifications and leadership experiences, to include, Search and Rescue Swimmer, Tactical Action Officer, Officer of the Deck, Special Weapons and Tactics, Small Craft OIC, Navy/Marine Corps Gold Parachutist Insignia, Instructor for countless weapons systems, Quality Assurance Officer for multiple munition systems and has had the privilege of leading tens of thousands of Sailors through thousands of high-risk training evolutions and real-world combat missions over his 22-year career. LT Moseley has always put America and the security of this nation first!

38.     On November 30, 2021, LT Moseley received an order to submit to weekly experimental COVID-19 testing by the Bunker Hill (CG-52) Commanding Officer, Captain Shea S. Thompson and Executive Officer, Commander Dan Kohlbeck.

39.     On December 1, 2021, LT Moseley was charged with an article 92, "Failure to obey a lawful order", received a Letter of Reprimand and was detached

for cause for not complying with the weekly experimental COVID-19 testing order.

40.    On December 7, 2021, LT Moseley submitted an appeal to the Non-Judicial Punishment to Commander Carrier Strike Group NINE

41.    On December 10, 2021, LT Moseley received notice of his Non-Judicial Punishment appeal denial from Commander, Carrier Strike Group NINE, RADM R.B. Chadwick.

42.    On March 14, 2022, LT Moseley received an adverse Fitness Report from Commanding Officer, USS Bunker Hill (CG-52) for refusing to comply with the experimental weekly COVID-19 testing and for being vaccinated against COVID-19.

43.    On May 20, 2022, LT Moseley was the defendant on a Board of Inquiry for refusing to comply with the experimental COVID-19 tests and injections. Three Senior Naval Officers, with the board member being a Captain with 39 years of service ruled unanimously, 3-0, "No basis for misconduct" Vaccine mandate likely to be unlawful, "No basis for substandard performance as an Officer" and "recommended for retention".

**Legal History of medical experimentation on U.S. Service Members and 21 U.S.C. § 360bbb-3 Legal and Historical Precedent.**

44.    The United States Government and Department of Defense have a long history of experimenting on its own service members as well as to depriving service members of their informed consent, right to refuse, or paying them compensation for forced experimental treatments. This trend unfortunately continues to the present day and is playing out for anyone currently serving and for prospective service members seeking to serve in the United States Armed Forces. Multiple historical examples led to a series of Congressional Acts to provide service members with basic human rights and the rights to bodily sovereignty. In

1953, the Department of Defense adopted the principles of the Nuremberg Code as official policy" of the United States. (Hasting Center Report, March-April 1991.)

45.   All medical products currently in use to diagnose, treat, cure, or prevent the spread of COVID 19 (from the SARS-COV-2 virus) are under an FDA granted Emergency Use Authorization pursuant to 21 U.S.C. §360bbb-3 and are also legally considered "covered countermeasures" pursuant to 42 U.S.C. §247d-6d, which grants all "covered countermeasures" and "covered persons" targeted liability immunity for "scopes of loss." This simply means that any individual accepting an EUA product must accept all of the health and legal liability risks of using a product with an EUA/covered countermeasure legal status, which is why individuals must be informed that the products they are using are under EUA, that EUA products are not approved/licensed/FDA cleared, and that they have an inherent right to refuse administration of an EUA product pursuant to 21 U.S.C. §360bbb-3(e)(1)(A)(i-iii). In fact, the right to refuse administration of unapproved products are legally and expressly "Required Conditions" because of the immense liability risk an individual assumes when taking unapproved, unlicensed products that have not undergone the full gamut of safety or efficacy tests, analysis, and screening by multiple health agencies.

46.   An Institute of Medicine report in 1993 estimated that some 60,000 members of the United States military were used as human subjects in the 1940s, and that just for two chemical agents – mustard and lewisite, both poisonous gases – and the majority of these people were not informed about the nature of the experiments, nor were they given proper medical care or follow-up after the research.[11] In the 1940s, the U.S. government repeatedly exposed military members to nuclear test blasts, producing a class of men who would come to be known as "Atomic Veterans." Estimates place the number of Atomic Veterans at

_____

[11] Institute of Medicine, Committee to Survey the Health Effects of Mustard Gas andLewisite, David P. Rall, and Constance M. Pechura. *Veterans at Risk: The Health Effectsof Mustard Gas and Lewisite*. Washington, D.C.: National Academy Press, 1993, pp. 3-4, 6-8, 50-52, 224-226.

approximately 400,000. It took until May 20, 1988, for the U.S. government "[t]o amend Title 38, United States Code, to provide a presumption of service connection to veterans (and survivors of such veterans) who participated in atmospheric or underwater nuclear tests as part of the United States nuclear weapons testing program or in the American occupation of Hiroshima or Nagasaki, Japan, and who suffer from certain diseases that may be attributable to exposure to ionizing radiation, and other purposes."[12]

47.     During the 1950s and 60s, the CIA and the Army engaged in experimentation on U.S. service members, both with and without their knowledge. In several different experiments, the DoD caused service members to unknowingly ingest hallucinogens. Most of the experiments centered on "mind control" and interrogation of persons under the effects of hallucinogens. This was prompted by the perception in U.S. intelligence that China and the Soviet Union had used, and were using, hallucinogens for "brainwashing" and interrogation of prisoners of war. This program was known by the code name MKULTRA. It involved giving LSD and another substance known as quinuclidinyl benzilate, a hallucinogen code-named BZ, to unsuspecting members of both the Armed Forces and even civilians.[13]

48.     In 1958, Master Sergeant James Stanley responded to a posting on Fort Knox, Kentucky, that solicited volunteers to help the Army develop methods for testing and defending against chemical weapons. The Army told volunteers they would be testing protective clothing. The Army then transferred MSgt Stanley to Aberdeen, Maryland, for the testing. He did not learn until 17 years later that he his command gave him LSD during the program without his knowledge. He found

---

[12] *See, e.g.*, Pub. L. 100-321, "Radiation Exposed Veterans Compensation Act of 1988." *See also* S. Prt. 103-97, "Is Military Research Hazardous to Veterans' Health? Lessons Spanning Half a Century," Staff Report for the Comm. on Veterans Affairs.

[13] *Human Drug Testing by the CIA, 1977: Hearings Before the Subcommittee on Health and Scientific Research of the Committee on Human Resources*, U.S. Senate, 95th Cong., 1st Session, 20-21 September 1977. Washington: U.S. Govt. Print. Off., 1977.

this out accidentally in 1975 when contacted by Walter Reed Army Medical Center, who was conducting follow-up on those who had participated in the 1958 test. Walter Reed wanted to know of any long-term health consequences to MSgt Stanley from his ingestion of the hallucinogen. MSgt Stanley in the intervening years had suffered health problems and hallucinations that he had no explanation for, and which he claimed had destroyed his marriage. MSgt Stanley sued, and his case went all the way to the Supreme Court, which found that MSgt – and all military members – had no cause of action if the harms they suffered were "incident to military service." *See United States. v. Stanley*, 483 U.S. 669 (1987). This determination opened the door for further experimentation and granted the DoD an immense amount of latitude to simply declare experiments or other heinous acts served as an incidental measure or action covered by military service. In essence, this ruling indicates that service members are free to experiment on at will by their own government and leadership in the name of "this comes with the job or is part of military service" which is in fact not ever covered or expressly stated in one's enlistment contract.[14]

49.    In 1989, just prior to the first Gulf War, the DoD sought to pretreat service members with several unlicensed (i.e. "investigational") new drugs, including pyridostigmine bromine ("PD") and a botulinum toxoid ("BT") vaccine, which could not be administered without informed consent. The DoD successfully petitioned the FDA to establish a new rule waiving U.S. servicemembers right to informed consent. The administration of these experimental drugs has been correlated with "Gulf War illnesses" that "debilitated over 174,000 service members."[15] Gulf War veterans then spent the next three decades petitioning the Department of Veterans Affairs and Congress for compensation and recognition of

---

[14] See Department of Defense Form 4 (DD4) "Enlistment/Re-Enlistment Document-Armed Forces of the United States, 4 May 2020.
[15] Dale Saran, *United States v. Members of the Armed Forces: The Truth Behind the Department of Defense's Anthrax Vaccine Immunization Program.*

the damaging effects of being given experimental, unlicensed products without their informed consent.

50.     Following multiple hearings and based on the treatment of the Gulf War veterans, Congress passed an amendment to the Fiscal Year National Defense Authorization Act (FY1998) to include an entire section to Title 10 U.S.C. [10 U.S.C. §1107] to ensure service members must receive informed consent and also established the President of the United States as the sole waiver authority to this statutory requirement.

51.     Immediately following the passage of 10 U.S.C. §1107, the DoD then turned around given these new statutory requirements and attempted to bypass the laws to administer the Anthrax Vaccine (AVA) based on perceived global bioterrorism threats. The DoD issued mandates requiring all service members to receive an Anthrax vaccine that was unlicensed for its use (also known as "investigational product") to protect service members against inhaled anthrax spores. In 2003, the District Court for the District of D.C. issued an injunction against both the Defendants DoD and FDA for their violations of that statute. See Doe v. Rumsfeld, 297 F. Supp. 2d 119 (D.D.C. 2003)("Rumsfeld I"). In the middle of that litigation in 2004, and in part as a result of the Anthrax Letter Attacks that occurred the week after 9/11, Congress passed the Project BioShield Act, the first version of the current EUA statute, 21 U.S.C. §360bbb-3. In response to the Project BioShield Act, Congress also passed 10 U.S.C. §1107a into law to address Emergency Use Products within the DoD. Once again, the President of the United States is the sole waiver of the right to be informed of service member rights to refuse EUA products.[16]

_____

[16] Note that the term "products" in 10 U.S.C. §1107a adopts the legal definition of "products" from 21 U.S.C. § 360bbb-3 defining products consist of biological products (shots), medical devices (test kits/masks), and drugs (pills/injectables), all of which can be granted an Emergency Use Authorization by the HHS through the FDA. In order to receive an EUA, the products must be unapproved (unlicensed) by the FDA to prevent, treat, cure, or diagnose a pandemic or endemic disease. 10 U.S.C. § 1107a does not further specify that the POTUS waiver or the section itself applies to a specific category nor does this section grant authorities to the DoD (or any DoD leader) to make a determination as to what products are or are not granted an EUA. Only the FDA or HHS can grant an EUA

**FDA Emergency Use Authorization of Unlicensed Products.**

52.    Section 564 of the FDCA, 21 U.S.C. § 360bbb-3, authorizes the FDA to issue an EUA for a medical drug, device, or biologic, **only** where certain pre-conditions are met. As relevant here, these conditions are: first, that HHS Secretary has declared a public health emergency (using declaration authority delegated in 42 U.S.C. § 247d-6d) that justifies the use of an EUA, 21 U.S.C. § 360bbb 3(b)(1); and second that the FDA finds that "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. §360bbb-3(c)(3). The FDA has a specific and affirmative statutory duty to "prohibit (d) the introduction or delivery for introduction into interstate commerce of any article in violation of section… 360bbb-3 of this title." 21 U.S.C. §331(d).

53.    There are significant differences between "FDA-approved (licensed/cleared)" products and products that granted an EUA are necessarily "legally distinct."[17] First, the requirements for efficacy are much lower for EUA products than for licensed products. EUAs require only a showing that, based on scientific evidence "if available" (*i.e.*, evidence is optional), "it is reasonable to believe," the product "may be effective" in treating, diagnosing, or preventing the disease.[18] 21 U.S.C. §360bbb-3(c)(2)(A). Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits ... outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb- 3(c)(2)(B). Third, EUA products are not subject to the PHSA's stringent manufacturing and labeling requirements, enjoy broader product liability protections, and therefore cannot be mandated due to

---

to a medical product.
[17] August 23, 2021 FDA Pfizer-BioNTech EUA Re-Issuance Letter, at 2 n.8, available at: https://www.fda.gov/media/150386/download; also the Reissued Pfizer-BioNTech EUA letter on 17 May 2022, page 14 at https://www.fda.gov/media/150386/download
[18] FDA Issued EUA Letters for Test Kits and Masks expressly state the phrase, "must conspicuously state" that these products (test kits or masks) are "The product has not been FDA cleared or approved." Also see Footnotes 10-12.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND MONETARY DAMAGES**

informed consent laws and regulations. 21 U.S.C. §360bbb- 3(e)(1)(A)(ii)(III) which is titled "Conditions of Authorization/Unapproved Product/Required Conditions" explicitly notes that it is designed "…to ensure that individuals to whom the product is administered are informed…of the option to accept or refuse administration of the product."

54. By the evidence provided and as demonstrated in multiple EUA letters from the FDA, the FDA's own express document states that the manufacturer of any EUA product cannot advertise that their product is "safe or effective" at treating, diagnosing, preventing, or curing COVID19. Furthermore, the FDA's own EUA documents state that test kits and mask manufacturers do not have to follow "good manufacturing practices in 21 CFR Part 820, each of these products is even less safe than a licensed product and places any individual at greater health and liability risk using these unapproved products.

**All COVID Tests and Masks are unlicensed and authorized for emergency use only.**

55. There are currently *no* licensed (FDA approved or cleared; legally defined as an unapproved product) test kits or masks with a license to prevent, diagnose, treat, or cure COVID19 caused by SARS-COV-2 pathogens.  21 U.S.C. § 360bbb-3(a)(2)(A) sets the legal basis for defining what defines an unapproved product. Masks and Test Kits both fall under sub-section (A) because they are *not approved*, *licensed, or cleared* by the FDA. The FDA issues an EUA letter to each manufacturer and product and a series of notices posted in the Federal Register EUA. The FDA maintains EUA repositories provide all EUA letters per every medical product category (shots, test kits, and masks).[19] [20] Also of note, mask and

---

[19] Food and Drug Administration Emergency Use Authorization Public Repository, updated 03 June 2022, at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#vaccines (accessed on 15 June 2022)
[20] Test Kits (49 In-vitro test kit EUA letters posted at the following link as of 15 June 2022): https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/in-vitro-diagnostics-euas-antigen-diagnostic-tests-sars-cov-2

test kit EUA letters openly, expressly state the following: "Current good manufacturing practice requirements, including the quality system requirements under 21 CFR Part 820 with respect to the design, manufacture, packaging, labeling, storage, and distribution of your product, but excluding Subpart H (Acceptance Activities, 21 CFR 820.80 and 21 CFR Part 820.86), Subpart I (Nonconforming Product, 21 CFR 820.90), and Subpart O (Statistical Techniques, 21 CFR Part 820.250)."[21]

56.    Similar waivers (a legal example of the FDA granting "other conditions" to an EUA product, which does not take away from "REQUIRED" conditions for unapproved products) to follow "good manufacturing practices outlined in 21 CFR 820.250 are clearly found in other test kit and mask[22] EUA letters. The fact that these documents expressly state that a manufacturer receives a waiver from the FDA (also a covered person) to *not follow* good manufacturing practices, coupled with the immense liability protections both the FDA and covered manufacturer possess (42 U.S.C. §247d-6d) creates incentives to produce products that cause harm to an individual and exposes an individual to immense individual risk.

57.    In short, the text of each EUA letter further demonstrates that test kits and masks are unapproved and inherently less safe than a licensed product and come with a lot of health, liability risks as well as the absence of any discernable long-term safety or efficacy data. All Emergency Use Authorization Letters, the boxes, the packaging, and device inserts must "conspicuously" state these products are unapproved/not cleared (licensed) by the FDA.[23] [24] [25] Masks and Test kits are

---

[21] BinaxNow EUA Letter, re-issued on 4 Feb 2022, BinaxNOW COVID-19 Ag Card Home Test - Letter of Authorization (fda.gov), see page 6.

[22] 5 August 2020 EUA Letter to Surgical Masks (non-sterilized) Manufacturers, https://www.fda.gov/media/140894/download, see page 6. (accessed 15 June 2022)

[23] BinaxNow EUA Letter, re-issued on 4 Feb 2022, BinaxNOW COVID-19 Ag Card Home Test - Letter of Authorization (fda.gov), see page 10. (accessed 15 June 2022)

[24] 20 April 2020 EUA Letter to Manufacturers Masks (general letter), https://www.fda.gov/media/137121/download (accessed 15 June 2022)

[25] 5 August 2020 EUA Letter to Surgical Masks (non-sterilized) Manufacturers,

legally defined as medical devices through in 21 U.S.C. § 321. All COVID19 masks and test kits are legally eligible for the FDA to grant an EUA because they are unapproved (unlicensed) and "meet" the conditions that they "may" be effective (as defined in each EUA letter) at preventing or diagnosing COVID19.

**Targeted Liability Immunity within 42 U.S.C. §247d-6d and the Inherent Right to Refuse.**

58.    All individuals accept full legal and health liability risks when they accept an unlicensed, unapproved product. All COVID19 EUA products are legally considered "covered countermeasures" through the Secretary of HHS's Public Health Emergency (posted in the Federal Register on March 17, 2020) as well as all subsequent amendments to the original COVID19 declaration pursuant to 42 U.S.C. § 247d-6d.    42 U.S.C. § 247d-6d's title is "Targeted liability protections for pandemic and epidemic products and security countermeasures." 42 U.S.C. § 247d-6d(a) discusses liability protections and states the following: "(1) In general Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

59.    U.S.C. § 247d-6d(a) (2) Scope of claims for loss states "(A) Loss; For purposes of this section, the term "loss" means any type of loss, including - (i) death; (ii) physical, mental, or emotional injury, illness, disability, or condition; (iii) fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and (iv) loss of or damage to property, including business interruption loss." Each of clauses (i) through (iv) applies

---

https://www.fda.gov/media/140894/download, see page 8. (accessed 15 June 2022)

without regard to the date of the occurrence, presentation, or discovery of the loss described in the clause.

60.    42 U.S.C. § 247d-6d.   Covered Countermeasures are defined In subsection (i): "(1) Covered countermeasure; The term "covered countermeasure" means - (A) a qualified pandemic or epidemic product (as defined in paragraph (7)); (B) a security countermeasure (as defined in section 247d–6b(c)(1)(B) of this title); (C) a drug (as such term is defined in section 201(g)(1) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(g)(1)), biological product (as such term is defined by section 262(i) of this title), or device (as such term is defined by section 201(h) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 321(h)) that is authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 360bbb–3, 360bbb–3a, 360bbb–3b]; or (D) a respiratory protective device that is approved by the National Institute for Occupational Safety and Health under part 84 of title 42, Code of Federal Regulations (or any successor regulations), and that the Secretary determines to be a priority for use during a public health emergency declared under section 247d of this title."

61.    42 U.S.C. § 247d-6d legally defines "covered person(s) as the following:   "(2) Covered person "The term "covered person", when used with respect to the administration or use of a covered countermeasure, means - (A) the United States; or   (B) a person or entity that is - (i) a manufacturer of such countermeasure; (ii) a distributor of such countermeasure; (iii) a program planner of such countermeasure; (iv) a qualified person who prescribed, administered, or dispensed such countermeasure; or (v) an official, agent, or employee of a person or entity described in clause (i), (ii), (iii), or (iv)." [*This means military and civilian government leaders fall into this category.*]

62.    When the Secretary HHS issued the COVID19 public health emergency as well as subsequent notices to grant products an EUA (pursuant to 21

U.S.C. §360bbb-3(h)) those EUA products (unapproved biologic products, devices, drugs, and ventilators) as well as the government (government officials, executive entities like the CDC, FDA, HHS, and DoD, JAGs, medical personnel), the manufacturer, the prescriber, and administrators all receive liability immunity from the identified scopes of loss. Individuals do not receive this same level of liability protection under the current federal laws.

63.    If an individual suffers any damages (or loss) from accepting a "covered countermeasure" then their only manner of recompense is to file a claim to the same individual/entity (also a covered person) that declared the public health emergency in the first place. The only method of filing a claim for damages or loss using a covered countermeasure is by filing a claim using the Countermeasure Injury Compensation Program (CICP). To date, there are approximately 8,000 claims for masks, test kits, shots, and ventilators found on the CICP website and repository. To date, the federal government paid $0 dollars for any COVID19 countermeasure injury related claim.[26]

**Flawed Test Kit Design from CDC and FDA FOIA Request and PCR Test Kit Studies.**

64.    In short, the Secretary of HHS grants liability immunity to covered countermeasures through 42 U.S.C. § 247d-6d statutory authority, which also grants full liability immunity to covered persons and covered countermeasures until the emergency declaration ends or the US receives fully licensed products to treat, cure, prevent, or diagnose COVID19. *This fact alone is why individuals are legally granted the inherent right to refuse EUA products*. (Emphasis added.)

65.    On July 21, 2021, the CDC published a study on the RT-PCR diagnostic panel, which are the bedrock assay panels used by other diagnostic test kits to diagnose the SARS-COV-2 pathogen. This study is entitled, "CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel" and

---

[26] Countermeasures Injury Compensation Program (CICP) Data | HRSA Accessed on 15 June 2022.

describes all of the technical aspects of developing and implementing the RT-PCR diagnostic panels. Buried in the document, on page 40, the CDC fully and openly admits, "Since no quantified virus isolates of the 2019-nCoV were available for CDC use at the time the test was developed and this study conducted, assays designed for detection of the 2019-nCoV RNA were tested with characterized stocks of in vitro transcribed full length RNA (N gene; GenBank accession: MN908947.2) of known titer (RNA copies/µL) spiked into a diluent consisting of a suspension of human A549 cells and viral transport medium (VTM) to mimic clinical specimen. Samples were extracted using the QIAGEN EZ1 Advanced XL instrument and EZ1 DSP Virus Kit (Cat# 62724) and manually with the QIAGEN DSP Viral RNA Mini Kit (Cat# 61904). Real-Time RT-PCR assays were performed using the Thermo Fisher Scientific TaqPath™ 1-Step RT-qPCR Master Mix, CG (Cat# A15299) on the Applied Biosystems™ 7500 Fast Dx Real-Time PCR Instrument according to the CDC 2019-nCoV Real-Time RT-PCR Diagnostic Panel instructions for use."[27] In laymen's terms, this report directly states that PCR test kits (nor this report) used or validated the results using "quantifiable (tangible or isolated)" viral isolates. Furthermore, the subtlety of elapsed time also shows that for approximately 18 months, the CDC nor any manufacturer used "quantified" viral isolates (quantified would mean tangible or isolated/proven) as the basis for their diagnostic panels. This fact alone demonstrates the dubious levels of efficacy for any test kit in being able to accurately pinpoint a specimen that the CDC never isolated from January 2020 (first positive PCR test) to July 21, 2021 (publication of the report above).[28]

66.    The CDC's published report on July 21, 2021, report places the efficacy of all other diagnostic test kits for COVID19 in serious question that they

---

[27] CDC 2019 Novel Coronavirus (nCoV) Real-Time RT-PCR Diagnostic Panel - Instructions for Use (fda.gov), accessed on 15 June 2022. This report has a publication date of 21 July 2022. Reference Page 40.
[28] CDC 2019 Novel Coronavirus (nCoV) Real-Time RT-PCR Diagnostic Panel - Instructions for Use (fda.gov), accessed on 15 June 2022. This report has a publication date of 21 July 2022. Reference Page 40.

are effective at identifying or differentiating SARS-COV-2 from other corona viruses. Again, if the basis for RT-PCR diagnostic panels were using "clinical specimens" and not a purified viral isolate, then it is challenging to develop any COVID19 countermeasure (defined in 42 U.S.C. § 247d-6d) that were used to generate the SARS-COV-2 "clinical specimen" mentioned in the report.  Also on July 21, 2021, the CDC issued a lab notice stating "After December 31, 2021, CDC will withdraw the request to the U.S. Food and Drug Administration (FDA) for Emergency Use Authorization (EUA) of the CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel."[29] The CDC notice subtly states there recommendation for labs using the EUA PCR diagnostic panels to, "consider adoption of a multiplexed method that can facilitate detection and differentiation of SARS-CoV-2 and influenza viruses. Such assays can facilitate continued testing for both influenza and SARS-CoV-2 and can save both time and resources as we head into influenza season."[30] In short, this notice indicates the PCR tests cannot differentiate between SARS-COV-2 or the influenza family of corona viruses, which is another way to say they are completely ineffective and inaccurate which is why PCR diagnostic panels are still unlicensed.

67.    Two FOIA requests in 2021 further prove that the CDC (nor any health agency) ever purified or isolated the SARS-COV-2 virus and developed diagnostic panels using virtually simulated, clinical specimens. This in turn means that manufacturers did not design panels using purified, isolated, or repeatedly proven SARS-COV-2 viral matter as the basis for test kit differentiation or identification which again demonstrates that negative and positive results are likely inaccurate. This fact is another one of many reasons EUA letters from the FDA direct EUA product manufacturers cannot advertise, "descriptive printed matter,

---

[29] Lab Alert: Changes to CDC RT-PCR for SARS-CoV-2 Testing, notice issued on 21 July 2021, last accessed on 15 June 2022)

[30] Lab Alert: Changes to CDC RT-PCR for SARS-CoV-2 Testing, notice issued on 21 July 2021, last accessed on 15 June 2022), second paragraph.

advertising, or promotional materials relating to the _use of your product may represent or suggest that this test is safe or effective for the detection_ of SARS-CoV-2."[31] FOIA, numbers #21-01076-FOIA (requested on 16 April 2021, answered on 7 June 2021) and 21-#21-02075-FOIA (requested 26 August 2021, response on 30 August 2021) both requested the following: "_[A]ll studies and/or reports in the possession, custody or control of the Centers for Disease Control and Prevention (CDC) and/or the Agency for Toxic Substances and Disease Registry (ATSDR) describing the purification of any "COV/D-19 virus" (including "8.1.1.7", "B.1.351 ", "P.1" and any other "variant") (via maceration, filtration and use of an ultracentrifuge; also referred to at times by some people as "isolation"), directly from a sample taken from a diseased human, where the patient sample was not first combined with any other source of genetic material (i.e. monkey kidney cells aka Vero cells; fetal bovine serum). Please note that I am not requesting studies/reports where researchers failed to purify the suspected "virus" and instead: cultured an unpurified sample or other unpurified substance, and/or •performed an amplification test (i.e. a PCR test) on all the RNA from a patient sample or from a cell culture, or on genetic material from any unpurified substance, and/or sequenced the total RNA from a patient sample or from a cell culture or from any unpurified substance, and/or produced electron microscopy images of unpurified things."[32]_ The response to FOIA #21-01076 states: "A search of our records failed to reveal any documents pertaining to your request. Specifically, the National Center for Immunization and Respiratory Diseases apprises that CDC does not purify or isolate any COVID 19 virus in the manner the requester describes."[33]

_//_

---

[31] BinaxNow EUA Letter, re-issued on 4 Feb 2022, BinaxNOW COVID-19 Ag Card Home Test - Letter of Authorization (fda.gov), see page 10. (accessed 15 June 2022)

[32] CDC FOIA Request #21-01076-FOIA and CDC FOIA Request #

[33] CDC FOIA Request #21-01076, page 1.

68.     The CDC's response to CDC FOIA #21-02075-FOIA included the June 7, 2021, redacted CDC response to #21-01076-FOIA as the only relevant document pertaining to the FOIA request. In short, the CDC did not have any evidence or record that the CDC (or any other health agency since they coordinate with global health entities) ever purified an isolated specimen of the SARS-COV-2 viral matter from a diseased human patient which calls into question the efficacy of all covered countermeasures (EUA products). So, the fundamental question remains, how can EUA products be effective if we never quantifiably isolated the SARS-COV-2 viral matter from the beginning of the declared pandemic?

## FIRST CAUSE OF ACTION

### Violation of Due Process Rights –

### U.S. Constitution, Fifth and Fourteenth Amendments

Plaintiffs Against All Defendants

69.     Plaintiffs restate and incorporate each of the previously stated paragraphs as those fully stated herein.

70.     The Fifth Amendment of the U.S. Constitution - Due Process Clause provides that no person may "be deprived of life, liberty or property without due process of law."

71.     The Fifth Amendment has been made applicable to the states and their political subdivisions through the Fourteenth Amendment.

72.     The Defendants' masking and testing mandates and policies require the Plaintiffs to succumb to the compelled use of unlicensed, unapproved EUA test kits and masks despite the right to refuse informed consent to the potential long-term adverse health effects of each EUA device, particularly because many of the harms of the EUA test kits and masks are unknown to the scientific community.

73.     The Defendants issued the orders and pursued disciplinary action against the Plaintiffs even when the Plaintiffs fully informed Defendants of all applicable laws against compelled use of EUA products, the right to accept or

refuse EUA products, and the fact that all EUA masks and test kits are unapproved, unlicensed EUA products.

74.    The Defendants' mask and test kit mandates and policies "substantially burden the liberty interest of the Plaintiffs" by removing all due process and replacing it with coercive choices between [1] refusing to provide informed consent the EUA mandated masks and test resulting in the loss of job placement, retirement benefits, educational benefits, health benefits, access to basic facilities, and eventually separation for the service; or [2] subjecting oneself to the untested, un approved EUA countermeasures. The Plaintiffs also face being barred from employment by the federal government or federal contractors due to the Federal Employee and Federal Contractor Mandates, and they will also face significant difficulties with private employers due to loss of security clearances for "misconduct" and negative discharge status.

75.    The Defendants unlawful orders and subsequent punishment of the Plaintiffs for refusal of the unlawful order completely disregard the fact that individuals have no recourse to the adverse health side effects associated with repeatedly taking EUA products. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 2021 WL 5279381, at *8 (5th Cir. 2021) ("*OSHA*"). In short, complying with unlawful orders to continually take EUA test kits and wear EUA masks will continuously expose the Plaintiff to long-term harms that are unknown to the scientific community.

76.    Accordingly, the Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining the Defendants from enforcing the DoD's testing and masking mandates.

77.    Pursuant to 28 U.S.C. §§ 2201-02 and other applicable law, the Plaintiffs are entitled to a declaration that the Defendant's testing and masking mandates or policies are unlawful and any further relief which may be appropriate.

//

78.     LT. Moseley seeks compensatory damages in an amount according to proof.

79.     Plaintiffs are entitled to their reasonable costs of suit and attorneys' fees.

80.     Plaintiffs are entitled to such other and further relief as the Court may deem appropriate.

## SECOND CAUSE OF ACTION

### Violation of Due Process Rights

### U.S. Constitution, Fourth and Fourteenth Amendments

Plaintiffs Against All Defendants

81.     Plaintiffs restate and incorporate each of the previously stated paragraphs as those fully stated herein.

82.     The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

83.     The Fourth Amendment has been made applicable to the states and their political subdivisions through the Fourteenth Amendment.

84.     Plaintiffs have fundamental constitutional rights to bodily integrity, including, especially, to be free from unconsented to or coerced EUA procedures, products, and/or medical treatment.  The right to control bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.  The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment.

//

//

85.    The United States Supreme Court has explained that invasive medical testing, injections, and other bodily intrusions constitute a search within the meaning of the Fourth Amendment.

86.    Americans do not surrender their constitutional rights, including their Fourth Amendment rights, when they become public officials, appointees, or employees.

87.    Defendant's orders and subsequent punishment regarding testing and masking policies violate the rights of personal autonomy, self-determination, bodily integrity, and the right to reject medical treatment protected by the Fourth and Fourteenth Amendments to the US Constitution. The Defendants' purported interest in the protection of lives through compelled testing and masking falls short of justifying any plenary override of Plaintiffs' individual liberty claims.

88.    The ability to decide whether to accept or refuse medical treatment including unlicensed, EUA medical treatments and products, is a fundamental right.  With this, Defendants must demonstrate that testing and masking mandates are narrowly tailored to meet a compelling interest, not just rely on the Plaintiffs to follow unlawful orders.

89.    Accordingly, the Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining the Defendants from enforcing the DoD's testing and masking mandates.

90.    Pursuant to 28 U.S.C. §§ 2201-02 and other applicable law, the Plaintiffs are entitled to a declaration that the Defendant's testing and masking mandates or policies are unlawful and any further relief which may be appropriate.

91.    LT. Moseley seeks compensatory damages in an amount according to proof.

92.    Plaintiffs are entitled to their reasonable costs of suit and attorneys' fees.

//

93.    Plaintiffs are entitled to such other and further relief as the Court may deem appropriate.

## THIRD CAUSE OF ACTION

**Violation of Informed Consent Law and the Public Health Service Act - 21 U.S.C. § 360bbb-3, 10 U.S.C. § 1107, 21 CFR Part 50, 42 U.S.C. § 262, & 5 U.S.C. § 706(2)(C)**

Plaintiffs Against All Defendants

94.    Plaintiffs restate and incorporate each of the previously stated paragraphs as those fully stated herein.

95.    The Plaintiffs have made many attempts, used administrative remedies available such as Inspector General Complaints, informal and formal Article 138 UCMJ redress requests, and directly engaging command to demonstrate to the Defendants that all testing and mask mandates are unlawful because they overtly violate 21 U.S.C. § 360bbb-3, 10 U.S.C. § 1107, 21 CFR Part 50 rights of all service members. Furthermore, all EUA products (test kits, masks, shots or medical devices, biological products, or drugs) receive full liability protections once they were declared 1) granted an EUA to treat, cure, diagnose, or prevent COVID19 and 2) Once the Secretary of HHS granted EUA products to also be "covered countermeasures" under 42 U.S.C. § 247d-6d via the PREP Act invocation of a public health emergency for COVID19.

96.    There are currently *no* licensed (FDA approved or cleared or legally defined as an unapproved product) test kits or masks in the US market with an FDA license to prevent, diagnose, treat, or cure COVID19 caused by SARS-COV-2 pathogens.  Individuals do not receive any protections for taking EUA products which is the legal reason anyone administering EUA products MUST abide by ALL REQUIRED conditions under 21 U.S.C. § 360bbb-3(e)(1)(A).

97.    Furthermore, mask and test kit EUA letters, which are the legal agreements between the US Government (FDA) and the manufacturers of EUA

products, openly state they are less safe through waiver of good manufacturing practices, cannot advertise their products are safe or effective, must conspicuously state they are "Not FDA approved or cleared," that negative test results are not presumptive and must be confirmed (which is the same for positive results), and they receive an EUA because there are no adequate, approved, or cleared products available to treat, diagnose, prevent, or cure COVID19. In short, all EUA products have a required condition to accept or refuse.

98.    In accordance with 10 U.S.C. 10 U.S.C. § 1107 and 10 U.S.C. § 1107a, there is no written POTUS waiver which waives the DoD or the Defendant's legal obligation to acknowledge and inform every member in their command that these products are in fact EUA (unapproved/unlicensed products). The Defendant's must follow the REQUIRED CONDITIONS established 21 U.S.C. § 360bbb-3(e)(1)(A) and yet on a daily basis the Defendants openly violate the law and inherent rights of their subordinates, to include the Plaintiffs. Even directing "vaccinated" individuals to use EUA test kits is unlawful and "vaccinated" members have the same Constitutional and statutory right to refuse EUA products.

99.    The Defendants enforcement of the DOD Mandate and the Armed Services Guidance are *ultra vires* actions taken in excess of their statutory authority, and in violation of the substantive requirements of the Informed Consent Laws, the PHSA, and the FDA's labeling regulations, insofar as they: (1) mandate an EUA product and seek to override service members' statutory informed consent and rights to refuse a non-FDA-licensed product; (2) direct the Armed Services, health care providers, and military treatment facilities to administer unlicensed EUA products as if they were legally interchangeable with (or legally equivalent to) FDA licensed products; and (3) seek to deceive service members' into forfeiting their informed consent rights by misrepresenting non-FDA-licensed EUA products as if they were FDA licensed products, and/or (4) by directing

service members to ignore (or refusing to provide altogether) the clear statements in the FDA-required labeling that they have the right to refuse the EUA product (as well as that test kits and masks are conspicuously labeled EUA products not FDA approved/cleared). The FDA statements on which Defendants rely do not override or waive informed consent rights to establish any legal equivalency between EUA and FDA-licensed products, or to waive the mandatory requirements of the FDA's labeling regulations.

100. The DOD Mandates, Armed Services Guidance, and Defendant's blind adherence to "following orders" to direct their subordinates to take EUA products must therefore be declared unlawful and enjoined insofar as they seek to mandate an EUA product, consistent with applicable precedent. See generally John Doe #1 v Rumsfeld, 341 F. Supp. 2d 1, 19 (D.D.C. 2004), modified sub nom. 2005 WL 774857 (D.D.C. 2005) (enjoining mandatory administration of EUA anthrax vaccine).[34]

101. As a result of Defendants' unlawful actions, Plaintiffs will be required either to submit to non-FDA-licensed EUA testing and masking, or else face the serious disciplinary consequences as outlined above under the Uniform Code of Military Justice (UCMJ), or adverse administrative action that would characterize Plaintiffs' voluntary service as "other than honorable" and that will result in the loss of their livelihoods, careers, benefits, and fundamental rights.

102. As a result of Defendants' unlawful actions, Plaintiffs have already suffered damages related to loss of job placement, retirement benefits, educational benefits, health benefits, and access to basic facilities in addition to the emotional distress associated with the violation of Constitutional rights.

---

[34] It is worth noting that the final chapter to the *Doe v. Rumsfeld* saga was an Equal Access to Justice Act (EAJA) suit by the *Doe* plaintiffs for payment of their legal fees. The court there found that the FDA and DoD's arguments for the mandatory
immunization of an unlicensed biologic – the same exact issue present here using the exact same arguments – were "not substantially justified" and the government was eventually ordered to pay plaintiffs' reasonable attorneys' fees. *Doe v. Rumsfeld*, 501 F. Supp. 2d 186, 190 (D. D.C. 2007).

103.   Accordingly, the Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining the Defendants from enforcing the DoD's testing and masking mandates.

104.   Pursuant to 28 U.S.C. §§ 2201-02 and other applicable law, the Plaintiffs are entitled to a declaration that the Defendant's testing and masking mandates or policies are unlawful and any further relief which may be appropriate.

105.   LT. Moseley seeks compensatory damages in an amount according to proof.

106.   Plaintiffs are entitled to their reasonable costs of suit and attorneys' fees.

107.   Plaintiffs are entitled to such other and further relief as the Court may deem appropriate.

## FOURTH CAUSE OF ACTION

### Violation of Fifth and Fourteenth Amendment Equal Protection -
### U.S. Const. Amends. V & XIV

Plaintiffs Against all Defendants

108.   Plaintiffs restate and incorporate each of the previously stated paragraphs as those fully stated herein.

109.   The Equal Protection Clause prohibits legal classifications that affect equally situated groups of citizens differently than others. (Engquist v. Or. Dept. of Agric. (2008) 553 U.S. 591, 601.) The touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable (Ross v. Moffitt (1974) 417 U.S. 600, 609).

110.   The DoD's Mandate and the Defendant's blind enforcement of testing and masking mandates (and command policies) creates two new classes of soldier that is recorded in no doctrine – and exists completely at the whim of the DoD and the Defendant's: (1) the "fully vaccinated, an undefined medical term also creates its own opposing subclass (2) known as those "not fully vaccinated." The members

of the second class get removed from their jobs even if they request religious or medical accommodation – in flagrant violation of the Religious Freedom Restoration Act and the DoD's own orders that claims that no adverse action will be taken against them during the "accommodation process."[35]

111. The "not fully vaccinate" or "unvaccinated" are threatened with discharge, punishment, or unlawfully implemented masking and testing policies. The Plaintiffs fall within these categories and continually face administrative punishment threats, Article 92 of the Uniform Code of Military Justice (UCMJ) violations (Failure to Obey a Lawful Order) for each instance the Plaintiffs refuse to accept EUA test kits or to wear masks.

112. LT Moseley faced separation for misconduct for refusing vaccines previously and ended up winning a case against the US Navy during a board of inquiry (BOI) to determine if the Plaintiff would be administratively discharged. The Plaintiff successfully won the BOI case 3-0 and the result is the BOI voted to fully reinstate the Plaintiff on the grounds that the vaccine mandate lawfulness was determined to be likely unlawful. Despite the fact the LT Moseley successfully demonstrated that the DoD and the US Navy unlawfully coerced service members into taking used EUA shots, which by extension fully applies to coercing others to use EUA masks and test kits which are both EUA medical products, the Defendant's continually threaten and direct the LT Moseley to continue testing. LT Moseley lost his current job aboard the USS Bunker Hill for refusing to take EUA test kits on the grounds that his refusal disrupts "good order and discipline." LT Moseley has repeatedly informed and demonstrated that all mandated products to diagnose, cure, treat, or prevent COVID19 are in fact EUA products and have a legal right to refuse.

---

[35] *See, e.g.*, *Navy SEAL 1 v. Biden,* No. 8:21-cv-2429, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021). The Air Force and Marine Corps purport to have recently granted a handful of RARs (*i.e.*, roughly a dozen out of nearly 25,000). However, these RARs appear to have been granted to those on terminal leave or conditioned upon their separation from the military. *See Navy SEAL 1 v. Austin,* --- F.Supp.3d ---, 2022 WL 534459, at *19 (M.D. Fla. Feb. 18, 2022); *Poffenbarger v. Kendall,* No. 3:22-cv-1, 2022 WL 594810, at *13 n.6 (S.D. Oh. Feb. 28, 2022).

113.   As a result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including being required to take an unlicensed test kit or masks with long-term safety profiles; being subject to or threatened with disciplinary action under the Uniform Code of Military Justice (UCMJ), and including adverse administrative action that would characterize The Plaintiff's' voluntary service as less than a full honorable discharge.

114.   Accordingly, the Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining the Defendants from enforcing the DoD's testing and masking mandates.

115.   Pursuant to 28 U.S.C. §§ 2201-02 and other applicable law, the Plaintiffs are entitled to a declaration that the Defendant's testing and masking mandates or policies are unlawful and any further relief which may be appropriate.

116.   LT. Moseley seeks compensatory damages in an amount according to proof.

117.   Plaintiffs are entitled to their reasonable costs of suit and attorneys' fees.

118.   Plaintiffs are entitled to such other and further relief as the Court may deem appropriate.

### FIFTH CAUSE OF ACTION

**Unconstitutional Conditions**

Plaintiffs Against all Defendants

119.   Plaintiffs restate and incorporate each of the previously stated paragraphs as those fully stated herein.

120.   The unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them. Unconstitutional conditions case law focuses on the existence of coercion by the government to induce a citizen – or class of citizens – to give up a right or benefit. According to this doctrine, the Defendants cannot impair

Plaintiffs' rights to refuse medical care through forms of coercion and through this mandate. *See, e.g.*, *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine ... vindicates the Constitution's enumerated rights by preventing the government from coercing the people into giving them up.")

121.    Unconstitutional conditions case law often references the existence of varying degrees of coercion. Accordingly, Defendants cannot impair Plaintiffs' right to refuse medical care through subtle forms of coercion any more than it could through an explicit mandate.

122.    For Plaintiffs to prevail, unconstitutional conditions claims do not need to establish that a challenged government policy amounts to coercion. Instead, it is sufficient that the Ordinance burdens a constitutional right by imposing undue pressure on an otherwise voluntary choice with a nexus to the exercise of a constitutional right. This is especially true when a government actor couples an unconstitutional condition with a procedural system stacked against the right-holder.

123.    The Defendants enforcement of the mandatory testing and masking mandates violate the unconstitutional-conditions doctrine, under which the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); see also *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013).

124.    The Defendant's further violate the Plaintiff's rights by weaponizing behavioral health and trying to mandate specific treatments or attribute the Plaintiff's current stance on post-traumatic stress disorder. The defendants are trying to remove the Plaintiff's ability to hold certain duties through the use of misusing behavioral health.

125.   This real controversy exists between Plaintiffs and Defendants, in that Defendants contend that they have the right, the power, and the authority to require Plaintiffs' coerced testing and mask wearing with EUA products as a condition of employment; and Plaintiffs maintain that such coercion is a form of duress, because they have the fundamental constitutional and statutory right to refuse EUA products without disruption of their livelihoods.

126.   Accordingly, the LT Moseley is entitled to temporary, preliminary, and permanent injunctive relief restraining the Defendants from enforcing the DoD's testing and masking mandates.

127.   Pursuant to 28 U.S.C. §§ 2201-02 and other applicable law, the Plaintiff is entitled to a declaration that the Defendant's testing and masking mandates or policies are unlawful and any further relief which may be appropriate.

128.   LT. Moseley seeks compensatory damages in an amount according to proof.

129.   LT Moseley is entitled to their reasonable costs of suit and attorneys' fees.

130.   LT Moseley is entitled to such other and further relief as the Court may deem appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgement against Defendants and provide plaintiff with the following relief:

1.   A declaratory judgement that any order attempting to involuntarily mandate an EUA product is *per se* unlawful;

2.   A declaratory judgement that Defendants' masking and testing orders challenged in this complaint violate plaintiff's rights under the Administrative Procedure Act;

3.   A declaratory judgement that the adverse punitive action already taken against plaintiff is unlawful and is to be set aside;

4.      A preliminary and permanent injunction prohibiting the defendants, their agents, Department of Defense officials, and any other person acting on their behalf from enforcing the testing and masking policies challenged in this Complaint;

5.      The Plaintiff's' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

6.      All other further relief to which plaintiff may be entitled.


Dated this 3rd Day of October 2022.


                                         WATKINS & LETOFSKY, LLP

                                            */s/ Daniel R. Watkins*
                              By:     _____
                                         Daniel R. Watkins
                                         2900 S. Harbor Blvd., Suite 240
                                         Santa Ana, CA 92704
                                         Attorneys for Plaintiffs.